**In the Matter of the Civil Commitment of Jesus Rosado Maldonado TRAVIS, Alleged Sexual Psychopathic Personality and/or Sexually Dangerous Person.**

Nos. A08–2213, A08–2234.

Court of Appeals of Minnesota.

June 23, 2009.

Lori Swanson, Attorney General, Steven H. Alpert, Nathan A. Brennaman, Assistant Attorneys General, St. Paul, MN, for appellant Minnesota Department of Human Services.

Geoffrey Anders Hjerleid, Sr. Assistant Olmsted County Attorney, Rochester, MN, for appellant Olmsted County Community Services.

Tedman J. Heim, Allen & Heim Law Office, Rochester, MN, for respondent Jesus Rosado Maldonado Travis.

Eric S. Janus, St. Paul, MN, amicus curiae.

Considered and decided by
SHUMAKER, Presiding Judge;
HALBROOKS, Judge; and CRIPPEN, Judge.

## OPINION

CRIPPEN, Judge.*

This appeal arises from a district court order for an evidentiary hearing to investigate the efficacy of treatment in the Minnesota Sex Offender Program (MSOP). Appellants, Minnesota Department of Human Services and Olmsted County, contend that evaluating the adequacy of treatment for a proposed patient is premature before commitment or treatment occurs.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

Respondent Jesus Rosado Maldonado Travis argues that the statutes are "unconstitutional by their administration" based on the history of the MSOP.

Because right-to-treatment claims are not ripe before commitment and because precedents rule out the pre-commitment inquiry, we reverse the pre-commitment hearing order and remand for further proceedings on the initial commitment petition.

## FACTS

Olmsted County petitioned for the civil commitment of respondent Travis on December 5, 2005. Two psychologists initially evaluated respondent. Dr. Rosemary Linderman concluded that respondent met the criteria for commitment as a sexually dangerous person (SDP), but recommended a stay of commitment proceedings to allow respondent to participate in sex-offender treatment without hospitalization in the MSOP. Dr. Peter Meyers concluded that respondent met the SDP criteria and the criteria for commitment as a sexual psychopathic personality (SPP) and recommended commitment as an SDP and SPP to the MSOP. The parties agreed to stay the proceedings while respondent participated in voluntary alternative treatment. After the court learned that behavioral issues led to respondent's discharge from the voluntary program, the court scheduled a pretrial conference for civil commitment to occur in May 2008. At the conference, Dr. Linderman's updated report recommended commitment both as an SDP and SPP. Later, a third examiner,

Dr. Paul Reitman, also concluded that respondent met both sets of criteria, but he recommended another stay for treatment without commitment.

At the pretrial conference, respondent provided notice to the county and the attorney general that he was challenging the constitutionality of Minn.Stat. §§ 253B.18, subd. 1(a), 253B.185, subd. 1 (2008). Respondent requested an order declaring that both commitment statutes are "rendered unconstitutional by their administration" and also are unconstitutional because they use the clear-and-convincing standard rather than the beyond-a-reasonable-doubt standard.[1] Following a hearing on this motion in July, the district court issued an order in November that called for an investigatory hearing and related discovery.

In support of its decision, the district court explained:

> The outer boundaries of involuntary civil commitment should be carefully policed by the courts.... In patrolling this boundary, courts must be mindful that treatment serves as the sole consideration that inoculates long term, secure confinement against the "punishment" label. Without careful judicial scrutiny to root out ineffective treatment programs, SDP/SPP commitment becomes indistinguishable from lifetime imprisonment.[2]

The court placed the burden of proof on the petitioner and declared that its showing would be subject to "strict scrutiny." The court characterized respondent's chal-

---

1. The district court did not decide respondent's standard-of-proof motion.

2. In its language and its citations, it is evident in the November order that the district court relied heavily on a law review article written by the amicus curiae, frequently citing to the article and employing its language. *See* Eric S. Janus & Wayne A. Logan, *Substantive Due*

*Process and the Involuntary Confinement of Sexually Violent Predators*, 35 Conn. L.Rev. 319, 369–70 (2003). As observed in our analysis, this reliance occurs despite the contrast between the hearing ordered by the court and the constitutional reform called for in the article.

lenge as one involving substantive due process, although respondent did not use that term in describing his constitutional argument. The court stated:

> It is alarming when one compares the current near zero "success" rates of the program with the fact that at least some of the earlier laws had eventually released as many as 50 percent of those committed. As a result, rather than being a "step away" from confinements for dangerousness alone, the actual implementation of the SDP/SPP laws suggest a regime of [preventive] detention itself, heretofore anathema to due process.

The district court's order stated that the hearing to follow would involve "an extensive inquiry into the conditions of confinement at MSOP," including past practices, patients' duration in the MSOP, any deficiencies in the program, and a "longitudinal pattern" of MSOP structure and implementation. The court indicated that it would consider "the amount of treatment provided (i.e. number of hours), . . . a professional evaluation of whether or not the program meets professional sex offender treatment standards, and . . . an evaluation of discharge patterns." [3]

After the July hearing, but before the November order, appellant Minnesota Department of Human Services (DHS) moved to intervene. Respondent and the county stipulated to allow the intervention. Appellants DHS and the county sought reconsideration of the November order and made these arguments: (1) respondent's

challenge was not ripe because he had not begun treatment; (2) evidence regarding the history of the MSOP is irrelevant because the affidavit of the current program director provided sufficient information about the MSOP; and (3) even if historical evidence was relevant, discovery would be overly burdensome for appellants. Appellants also sought to stay the November order pending appellate review.

The district court heard the reconsideration motions and issued a second order in December 2008. The court placed the burden of proof on respondent and required respondent to establish unconstitutionality beyond a reasonable doubt. This shift reflected the court's conclusion that the previous "strict scrutiny" burden "would apply to 'facial' due-process challenges to the statute," already determined, but that respondent challenged the statutes "as applied." [4] The court denied appellants' request for a stay and determined that respondent's claim was ripe because his commitment was "certainly impending." Appellants then petitioned for discretionary review by this court, which was granted.

### ISSUES

1. Is respondent's claim ripe for inquiry?

2. Can the district court examine substantive due process in a challenge to the constitutional purpose of civil commitment statutes by investigating treatment in

---

3. On the record, the court explained that the hearing would involve a "sweeping examination" of the MSOP.

4. During the hearing, the court further explained the relationship between the hearing and the prospective treatment of respondent: "It is an as-applied. You have to look at this program in its entirety to determine whether or not the statute is unconstitutional as it is

applied not only to [respondent] but to everybody else. . . . I think my memorandum is relatively clear about that, that you have to look—there has to be some history to this, and I think that there is, and that's the only way you can determine whether or not something is unconstitutional as applied to put it in its historical perspective."

practice and thus by studying the experiences of others?

3. Did the district court err in shifting the burden of proof on respondent's claim that the statutes violate the constitution?

## ANALYSIS

The district court's order has broad implications, both in terms of announcing a substantive-due-process doctrine and launching a "sweeping examination" of the MSOP.[5] But the scope of the issues in the case is decidedly confined. Similarly, the range of a necessary examination of precedents does not suggest the breadth of our review.

Thus, we note at the outset of this analysis that our review does not address a large number of constitutional topics related to commitments under the relevant statutes. Except in the context of an initial examination of ripeness, our decision does not deal with the topic of substantive due process in terms of the patient's right to treatment (or like statutory rights), a concept that implicates the patient's treatment experience. Likewise, the decision does not address, either favorably or adversely, the thesis in a law review article that the district court cited as authority for its orders but that deals in fact with another topic. *See* Janus, *supra* at 322 (favoring a patient's enlarged substantive-

due-process right for release following a period of treatment).

Similarly, this decision does not address due-process claims premised on application of the statutes to the pre-commitment condition of a prospective patient. And the decision has no direct affect on numerous other claims that commitments, which deny some process available in criminal cases, are punitive or merely preventive, including the topics of double jeopardy, ex post facto, cruel punishment, trial process, and equal protection of the laws. Similarly, although the district court's wide-ranging inquiry conflicts with governing cases, our decision does not address a focused inquiry on narrowly defined topics.

Finally, as will be stated more fully later in this opinion, we do not address the significance of public information discussed by amicus curiae and briefly noted by the district court.

### 1.

■ Respondent asserts that the SDP/SPP commitment statutes are "unconstitutional" because of their "administration" but fails to articulate the substantive basis for a constitutional determination. Concluding that the district court was examining respondent's right to treatment, appellants contend that respondent's claim is not ripe because respondent has not been

---

5. As we stated when describing the facts of the case, the district court reached the conclusion, without citation or discussion of relevant precedents, that substantive due process should be determined by investigating past and present treatment practices, and the experiences of persons other than respondent, to learn if the legislative purpose to provide treatment is fulfilled in fact.

Although the court's December 2008 order states that its inquiry is directed at the statutes "as applied" and not to the facial characteristics of the statute, a finding of constitutional invalidity would have extensive consequences (affecting respondent and

others) that bear twin-like resemblance to those arising when a statute is found facially unconstitutional.

Similarly striking is the court's determination to set out on an "extensive," "detailed" inquiry, for the purpose of patrolling or policing treatment programs; the district court advised the parties that "[this] may take a long time."

Finally, the magnitude of the court's order is enlarged by its determination, even without a hearing, that discharge information suggests these Minnesota statutes are unconstitutional, "anathema to due process."

committed and is not currently receiving involuntary treatment.

■■■ Justiciable controversies are required for adjudication because courts do not issue advisory opinions. *Izaak Walton League of Am. Endowment, Inc. v. State, Dep't of Natural Res.,* 312 Minn. 587, 589, 252 N.W.2d 852, 854 (1977). Justiciability issues receive de novo review. *State by Friends of the Riverfront v. City of Minneapolis,* 751 N.W.2d 586, 592 (Minn.App. 2008), *review denied* (Minn. Sept. 23, 2008).

■■■ Ripeness seeks to prevent courts' involvement "in abstract disagreements over administrative policies." *Leiendecker v. Asian Women United of Minn.,* 731 N.W.2d 836, 841 (Minn.App.2007) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior,* 538 U.S. 803, 807, 123 S.Ct. 2026, 2030, 155 L.Ed.2d 1017 (2003)), *review denied* (Minn. Aug. 7, 2007). Ripeness requires an evaluation of "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n,* 538 U.S. at 808, 123 S.Ct. at 2030. If an issue involves only a hypothetical possibility, then the issue is not justiciable because "[n]either the ripe nor the ripening seeds of a controversy are present." *Lee v. Delmont,* 228 Minn. 101, 110, 36 N.W.2d 530, 537 (1949). For justiciable controversies, the parties disputing a statute's constitutionality must show that they received a "direct and imminent injury" from the allegedly unconstitutional section. *State v. Colsch,* 284 N.W.2d 839, 841 (Minn.1979); *see Lee,* 228 Minn. at 111, 36 N.W.2d at 537 (noting that to invoke court's jurisdiction, party must show actual or imminent injury).

To the extent that respondent's argument involves his right to treatment, the issue is not ripe. Respondent's injury is neither direct nor imminent because the district court has not found that he meets the commitment criteria—only that commitment is likely. Without commitment as an SDP or SPP to MSOP, treatment at MSOP will not occur, and respondent's injury is only a hypothetical possibility. *See Lee,* 228 Minn. at 111, 36 N.W.2d at 537 (invoking court's jurisdiction requires litigant to "show an injury or at least one that is imminent").

Other Minnesota cases have concluded that the right-to-treatment argument is premature even after the district court orders civil or criminal commitment. *See Bailey v. Noot,* 324 N.W.2d 164, 167–68 (Minn.1982) (noting that because appellant could not predict that he would be deprived of treatment while in prison, his argument was premature); *In re Wicks,* 364 N.W.2d 844, 847 (Minn.App.1985) (noting that "right-to-treatment issue is not reviewed on appeal from a commitment order"), *review denied* (Minn. May 31, 1985); *In re Pope,* 351 N.W.2d 682, 683–84 (Minn.App.1984) (noting that Pope's claim about receiving "inadequate treatment is speculative and premature" because no deprivation of treatment had occurred); *In re Kennedy,* 350 N.W.2d 484, 485 (Minn. App.1984) (noting that right-to-treatment issue can only be raised after deprivation of treatment); *In re Martenies,* 350 N.W.2d 470, 472 (Minn.App.1984) (noting that without deprivation of treatment, issue was premature because appellant had not yet been sent to commitment facility), *review denied* (Minn. Sept. 12, 1984).

In addition, respondent shows no hardship in withholding consideration, no adverse affect of delay before treatment is ordered and occurs. As appellants note, there is no showing that respondent could not raise his right-to-treatment argument through other legal avenues after commitment, such as habeas corpus, 42 U.S.C. § 1983 (2006), declaratory or injunctive re-

lief, or the special review board. *See* Minn.Stat. § 253B.22 (2008) (providing review boards for patients).

Because respondent has not been committed, has not yet received MSOP treatment, and may have other legal avenues, none of his arguments relating to his right to treatment are ripe, and neither this court nor the district court reach the claims. Appellants are entitled to relief on this issue.

### 2.

*Substance and Breadth of District Court Inquiry*

■ Appellants are not entitled to a similar determination to the extent that the district court has identified, separate from a right to treatment inquiry, a substantive-due-process standard that permits a pre-commitment investigation of the purpose of the SDP/SPP statutes by examining past and present treatment practices. Neither the court nor respondent has narrowly confined their rationale to the subject of respondent's right to treatment. Yet, despite the ripeness of the alternative examination that may lie at the root of the district court's order, the investigation has no merit because it conflicts with relevant appellate decisions in Minnesota, other states, and the federal courts.

Respondent and amicus curiae characterize the district court's constitutional examination by arguing that the civil commitment statutes are "unconstitutional by their administration" based on "persistent patterns of implementation." They contend that examining treatment at MSOP by weighing information such as release patterns and confinement conditions proves that the statutes are unconstitutional and should not be applied to respondent. In other words, they assert that the district court should examine respondent's possible confinement by investigating the confinement of others. These arguments fail in the face of governing caselaw.

Because the district court cited for support only the 2003 law review article co-authored by amicus curiae, and because respondent defers to amicus for detailing and supporting the constitutional rationale underlying the district court's order, our review necessarily centers on the materials in the amicus brief, which include a reference to authorities and discussion in the author's earlier article.

We repeat that the substantive-due-process right proposed in amicus's 2003 article was in the form of an expanded right of release for committed patients, not a pre-commitment inquiry. *See* Janus, *supra* at 322 (questioning when "substandard conditions mandate the release of detainees, as opposed to simply supporting injunctive or monetary relief"). Moreover, the case discussion in the article suggested an environment for such a legal development, not that the proposition was currently permitted. *Id.* at 370–78. Thus, for example, the article discusses the decision in *Seling v. Young,* 531 U.S. 250, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001), but acknowledges merely that the case does "nothing to undercut the viability of an as-applied substantive due process claim." Janus, *supra* at 337. Amicus now cites these cases and uses them to support the district court's more expansive substantive-due-process investigation. But the cases preclude the district court's pre-hearing inquiry, most certainly in its sweeping scope.

*Minnesota Cases*

The cornerstone of Minnesota's recent jurisprudence on the constitutional validity of the SDP/SPP statutes is the 15–year–old holding of the supreme court in *In re Blodgett,* 510 N.W.2d 910 (Minn.1994). In *Blodgett,* the supreme court examined the constitutionality of the psychopathic personality act, Minn.Stat. § 526.09 to 526.10

(1992) (the PP Act). *Blodgett*, 510 N.W.2d at 911. Suggesting the common characteristics of precedents addressing the constitutional validity of commitment statutes, the analysis centers on the condition of the patient and the statutory commitment standards. *Id.* at 914–16. The patient's constitutional challenge was facial, which had its ordinary focus on applications of the statutes to prospective patients. *See Soohoo v. Johnson*, 731 N.W.2d 815, 821 (Minn.2007) (stating that successful facial challenge requires proof that statute is not valid under any set of circumstances).

Following the district court's initial commitment of Blodgett, the court conducted a 60–day review hearing, at which Blodgett challenged the statute's constitutionality. *Blodgett*, 510 N.W.2d at 912. The statutorily required report from the Minnesota Security Hospital (MSH) opposed Blodgett's indeterminate commitment under the PP Act. *Id.* Dr. Michael Farnsworth, who worked at MSH, took the position that any treatment Blodgett was offered at MSH would be a sham. *Id.* Based on evidence that contradicted these reports, including the opinion of the second court-appointed examiner, the district court ordered Blodgett's indeterminate commitment. *Id.* This court upheld the commitment and held that the PP Act was constitutional. *Id.*

Upon further review, the supreme court examined cases dealing with application of commitment standards of law, beginning with discussion of *State ex rel. Pearson v. Probate Court*, 205 Minn. 545, 287 N.W. 297 (1939), *aff'd sub. nom. Minn. ex rel. Pearson v. Probate Court*, 309 U.S. 270, 274, 60 S.Ct. 523, 526, 84 L.Ed. 744 (1940). *Blodgett*, 510 N.W.2d at 913. *Pearson*, as the court noted, narrowed lawful PP Act commitment standards to prospective patients whose habitual course of sexual misconduct shows "an utter lack of power to

control their sexual impulses," and who will likely attack or inflict other harm "on the objects of their uncontrolled and uncontrollable desire." *Blodgett*, 510 N.W.2d at 913 (quoting *Pearson*, 205 Minn. at 555, 287 N.W. at 302).

Blodgett argued that recent Supreme Court decisions, such as *Foucha v. Louisiana*, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), had overruled *Pearson* by stating limited categories of permissible confinement. *Blodgett*, 510 N.W.2d at 914. The supreme court determined that the *Pearson* standard for commitment was still valid under one of *Foucha*'s confinement categories, which permits confinement of the "mentally ill and dangerous." *Blodgett*, 510 N.W.2d at 914. The court concluded that the term "psychopathic personality" in the PP Act was "an identifiable and documentable violent sexually deviant condition or disorder." *Id.* at 915. Addressing possible misapplications of the PP Act, the court said the remedy was to review errors, not to declare the act unconstitutional. *Id.*

Most significant to the case now on appeal, the supreme court then addressed the question of whether the psychopathic personality condition was treatable or whether confinement was merely preventive detention. *Id.* at 916. The court stated that even when treatment is problematic, the state's interest in others' safety is no less legitimate and compelling. *Id.* And the court concluded that if confinement is programmed to provide treatment and guarantees periodic review of the need for treatment, due process is satisfied. *Id.* The court determined that MSOP provided both and concluded that the PP Act did not violate substantive due process. *Id.*

Amicus curiae infers from *Blodgett* the declaration of a judicial obligation to monitor implementation of the act. But the demands of due process were found specif-

ically satisfied by the record that commitments were programmed for treatment, provided for periodic review of the need for treatment, and permitted demands on the right to treatment.

The *Blodgett* court also declared that the commitment act did not violate equal protection. *Id.* at 916–17. After determining that the district court had properly required clear and convincing evidence, the court also approved the standard of proof and the right to counsel. *Id.* at 917. The court ultimately concluded that *Pearson* should continue to be followed "until the United States Supreme Court says otherwise." *Blodgett,* 510 N.W.2d at 918.

More recent Minnesota precedents confirm an examination of constitutional validity that addresses the proposed patient's condition and the commitment standards, not the implementation of treatment programs with other, committed patients. In *In re Linehan,* 557 N.W.2d 171, 174 (Minn. 1996) (*Linehan III*), *vacated & remanded,* 522 U.S. 1011, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997), *aff'd,* 594 N.W.2d 867 (Minn. 1999) (*Linehan IV*), the Minnesota Supreme Court evaluated the constitutionality of the sexually dangerous person act (the SDP Act) in response to Linehan's substantive due process, equal protection, ex post facto, and double jeopardy challenges.

After Linehan's release, following the supreme court's reversal of his PP Act commitment, the legislature passed the SDP Act, and the state petitioned to civilly commit Linehan under this statute. *Linehan III,* 557 N.W.2d at 175–76. After hearing conflicting testimony, the district court ordered Linehan's initial commitment as an SDP. *Id.* at 176–78. This court affirmed, and the district court ordered indeterminate commitment after the required 60–day review. *Id.* at 178. The supreme court, after noting how the new

statute departed from the PP Act, determined that "the SDP Act is substantially the same as the PP Act" in operation. *Id.* at 179; *see also id.* at 179 n. 8 (noting that "psychopathic personality" under former statute was equivalent to "[s]exual psychopathic personality" under 1994 amendment). The supreme court also noted that due process concerns "require that future harmful sexual conduct must be highly likely" for commitment under the SDP Act. *Linehan III,* 557 N.W.2d at 180.

The *Linehan III* court employed a strict scrutiny standard and placed the burden on the state, but determined, as it had in *Blodgett,* that protecting the public from sexual assaults and treating and caring for mentally disordered people qualified as compelling interests. *Linehan III,* 557 N.W.2d at 180–81. The court considered the analysis in *Foucha,* as well as its decision to uphold the PP Act in *Blodgett. Linehan III,* 557 N.W.2d at 182. Although the SDP Act differed from the SPP Act, the supreme court found that *Blodgett* was indistinguishable and did not preclude, as grounds for commitment under the substantive-due-process analysis, milder forms of antisocial personality disorders. *Linehan III,* 557 N.W.2d at 182. The supreme court reaffirmed *Blodgett* and concluded that the SDP act complied with substantive due process. *Linehan III,* 557 N.W.2d at 186. The court evaluated Linehan's equal protection argument and concluded again that *Blodgett* controlled. *Linehan III,* 557 N.W.2d at 186–87.

The court also concluded that the SDP Act was "facially civil and [was] not so punitive in purpose or effect to trigger" the ex post facto or double jeopardy clauses. *Id.* at 188–89. On this question, by noting the absence of evidence that the treatment provided was a sham, the court did not preclude a different analysis on a better record. *Id.*

Later, the Minnesota Supreme Court re-examined the SDP Act's constitutionality. *In re Linehan,* 594 N.W.2d 867 (Minn. 1999) (*Linehan IV*). The United States Supreme Court had vacated the *Linehan III* decision in light of *Kansas v. Hendricks,* 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997), which upheld Kansas's civil commitment statute. *Linehan IV,* 594 N.W.2d at 871. Considering issues raised in *Hendricks,* the *Linehan IV* court noted that the SDP Act was not retributive and observed that the SDP Act, like Kansas's act, only used prior criminal acts for evidence and used the mental abnormality requirement without implicating deterrence. *Linehan IV,* 594 N.W.2d at 871–72. The court determined that the SDP Act, like the Kansas act, required "evidence of past harmful sexual behavior and a present qualifying disorder or dysfunction that makes future dangerous conduct highly likely if the person is not incapacitated." *Id.* at 874.

Finally, in *Hince v. O'Keefe,* 632 N.W.2d 577, 579 (Minn.2001), Hince and his fellow appellants, who were civilly committed under the SDP Act, sought a determination that the DHS commissioner must establish a review board for MSOP facilities under Minn.Stat. § 253B.22, subd. 1 (2000). *Hince,* 632 N.W.2d at 579. The district court dismissed the action, and this court affirmed. *Id.* The supreme court examined the review-board statute and concluded that patients committed under SDP/SPP laws had access to the same review board available to other committed patients. *Id.* at 585. *Hince* does not, as amicus curiae suggests, alter the state of the law under *Blodgett* and *Linehan.*

In its rejection of state arguments that distinguished between MSOP facilities and mental-illness treatment facilities, the *Hince* court expressed concern about the constitutional implications for SDP and SPP commitments if mental illness were not a component of civil commitment under those acts. *Id.* at 583. Amicus curiae in this case cites *Hince* as having warned that ineffective implementation could render the SDP/SPP statutes unconstitutional. But *Hince* addressed the rights of those already committed to seek release and stressed the importance of focusing on the patient's mental illness. *Id.* It does not support a pre-commitment inquiry aimed at showing contrast between statutory provisions and actual practice.

In sum, the Minnesota cases examine the language of the statutes, legislative history and intent, and legal precedents. *See id.* at 580–82 (examining SDP Act in light of legal precedents). They require a focus on the condition of an individual committed patient or a prospective patient. The statutes involved have repeatedly survived objections to facial validity, and none of the cited cases provide support for a pre-commitment "as-applied" challenge that would be proved by looking at the cumulative experience of all those who have previously been committed and treated.

### The United States Supreme Court

The Minnesota cases through 1999 (*Linehan IV*) also reflect the decisions of the United Stated Supreme Court in *Pearson, Foucha,* and *Hendricks. See, e.g., Linehan III,* 557 N.W.2d at 186 (citing *Pearson*); *id.* at 181–82 (discussing *Foucha*); *Linehan IV,* 594 N.W.2d at 870–71 (discussing *Hendricks*). And the reasoning in the Supreme Court cases, as in the Minnesota cases, encompasses the Court's requirements, cited by amicus curiae, in *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) and *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). In his 2003 article, where amicus advanced an enlarged right of patients for release from treatment, he

correctly acknowledged the state of existing law as authority for an "expansive view of police power." Janus, *supra* at 346.

The 2003 depiction of law by amicus was inclusive of *Seling*, in which the Supreme Court, four years after *Hendricks*, addressed Washington's civil commitment act. *Seling*, 531 U.S. at 254–55, 121 S.Ct. at 730–31. Despite the acknowledgment of "expansive" holdings on police powers, amicus looks to *Seling* to advance the district court's recognition of a broader right of substantive due process. But there is nothing in *Seling* that permits broadly examining treatment practices to determine whether the governing statute is wholly unconstitutional.

The *Seling* Court reviewed the Ninth Circuit's decision to uphold patient Young's ex post facto and double jeopardy challenges to the Washington civil commitment statute. *Id.* at 258–59, 121 S.Ct. at 732–33. Although the Ninth Circuit denied Young's substantive-due-process claim, he did not appeal this decision. *Id.* at 259, 121 S.Ct. at 733. Thus, the Supreme Court declared that it had "no occasion to consider how the civil nature of a confinement scheme relates to other constitutional challenges, such as due process." *Id.* at 266, 121 S.Ct. at 736. This limited scope of the *Seling* review eliminates its holding as support for the district court's decision in this case. Moreover, the opinion in *Seling* directly undercuts the district court's due process investigation in the case on appeal to this court.

The Supreme Court observed at the outset of its analysis the similarity of the Washington act to the Kansas scheme reviewed in *Hendricks*. *Seling*, 531 U.S. at 260–61, 121 S.Ct. at 733–34. The Court noted that to determine an act's nature, its text and legislative history must be examined. *Id.* at 262, 121 S.Ct. at 734. Responding to Young's assertions that actual treatment-center conditions contradicted its stated purposes, the Court declared that Young could not succeed "through an 'as-applied' challenge." *Id.* at 263, 121 S.Ct. at 735.

The Court concluded that such an as-applied examination would be "unworkable . . . an analysis [that] would never conclusively resolve whether a particular scheme is punitive" and would "prevent a final determination of the scheme's validity under the Double Jeopardy and Ex Post Facto Clauses." *Id.* The Court reached this conclusion because the confinement spans a time period under changing conditions; the Court noted the "inherent difficulty in ascertaining current conditions and predicting future events." *Id.* at 267, 121 S.Ct. at 737. The Supreme Court concluded that the act's civil nature "cannot be altered based merely on vagaries in the implementation of the authorizing statute." *Id.* at 263, 121 S.Ct. at 735.

Thus, insofar as *Seling* addresses an inquiry on actual practices, it negates their significance. This being said, the decision specifically contemplates a patient's rights to demand treatment. The Supreme Court noted that Young and others like him had other remedies like "a state law cause of action [on right to treatment]," which would belong in the Washington courts; challenges in state and federal courts using the federal Constitution; or a § 1983 action, which Young already had pending against the facility. *Id.* at 265, 121 S.Ct. at 736.

Further addressing Young's assertions on actual practices, the *Seling* Court declared that, "[w]hatever [precedents] may suggest about the relevance of conditions of confinement, they do not endorse" an approach that would "render the inquiry . . . completely open-ended." *Id.* at 266–67, 121 S.Ct. at 737. The *Seling* opinion specifically declines to endorse the sweep-

ing inquiry into treatment methods, as ordered by the district court.

In sum, the Supreme Court precedents preclude the district court's substantive-due-process inquiry, calling instead for protecting an individual's right to treatment and examining the facial topics fully addressed by precedents in Minnesota. *Seling* adds no further dimension to the law, questions the fruitfulness of any effort to examine practice, and specifically denounces the occurrence of a completely open-ended inquiry.

*Cases from Other Jurisdictions*

Amicus curiae cites four other cases to support the district court's orders. We examine these as well in the absence of citation of supporting authorities by the district court or respondent.

*Sas v. Maryland,* 334 F.2d 506 (4th Cir. 1964), does not address substantive due process. In this case, the Fourth Circuit evaluated five habeas petitions challenging the constitutionality of the state's defective delinquent act. *Id.* at 509. The court found the statute constitutional on its face, but expressed concern about deficient or ill-conceived administration and remanded the case to provide petitioners with an appropriate hearing to "determine whether the statute is being constitutionally applied." *Id.* at 509, 516–17.

But the *Sas* court specifically anticipated a study of implementation or administration only to determine if this demonstrates civil process permitting denial of conventional criminal procedural safeguards in the commitment proceedings. *Id.* at 509. The court also anticipated the hearing would permit examining equal protection questions, implications of cruel treatment for a mere property offender, expert testimony indicating whether the statute is unconstitutionally vague, and procedures in place to protect the patient's right to confrontation. *Id.* at 509, 514. Moreover,

having been decided 40 years before *Seling, Sas* has no occasion to deal with the extensive intervening Supreme Court jurisprudence, including that Court's declarations on the impropriety of examining actual administration.

In *Commonwealth v. Page,* 339 Mass. 313, 159 N.E.2d 82, 83–84 (1959), the Massachusetts Supreme Judicial Court questioned the sufficiency of a treatment program to fulfill the non-penal purposes of the governing statute, but the case does not deal with substantive due process or the details of implementing a treatment program.

Page sought a jury trial and argued that, because no treatment center had been established, the statutory provisions about commitment were inoperative until the center was established. *Id.* at 84. Holding that this request had merit, the Massachusetts court determined that Page's commitment, without a treatment program to carry out the purpose of the act, amounted to confinement in prison without a jury trial for an indefinite period after he had served his sentence. *Id.* at 86.

But *Page* goes to basic programming. The court's concern was prompted by staff testimony that committed people were placed in Concord's general prison population, the existing treatment center was only for diagnostic purposes, and there were only 12 beds in the center. *Id.* at 84–85. The staff also testified that the center had no separate staff to treat sex offenders and that the only available treatment for those committed for periods longer than required for diagnosis "was the program of group and individual psychiatric therapy for the total prison population which might include sex offenders." *Id.* at 85 (quotation marks omitted). The court held that "a confinement in a prison which

is undifferentiated from the incarceration of convicted criminals is not remedial so as to escape constitutional requirements of due process." *Id.*

The circumstances in *Page* fundamentally contrast with the current treatment programming in Minnesota. This was determined in *Blodgett* in 1994. *Blodgett,* 510 N.W.2d at 916. It is detailed again in the present record in an affidavit of the MSOP director. Because of this contrast, *Page* is of limited persuasive value in the present case.

Finally, amicus curiae cites two decisions of the Washington Supreme Court, but neither case leaves room for the judicial inquiry into practices ordered by the district court.

In the case of *In re Young,* the Washington Supreme Court's conclusions provide authority neither for a substantive-due-process inquiry into practice nor an open-ended form of investigation. 122 Wash.2d 1, 857 P.2d 989, 994–96 (1993), *superseded by statute,* 1995 Wash. Sess. Laws Ch. 216 § 9. In *Young,* the numerous appeal arguments of two committed patients included an assertion that the commitment act violated substantive due process. *Id.* at 1000. The court held that the Washington act did not violate substantive due process. *Id.* at 1018.

Responding to the argument that treatment of sex offenders was impossible, the court noted that "petitioners have failed to show that the *specific* conditions of confinement are incompatible with treatment." *Id.* at 1003 (emphasis in original). And the court concluded that the act provided for treatment and the petitioners have not shown that the treatment "cannot be effectuated under the Statute's terms." *Id.*

These observations on deficiencies in proof have evident reference to the nature of treatment programming, not the breadth of prospective proof. In *Young,* the Washington Supreme Court cited as its point of reference *Allen v. Illinois,* 478 U.S. 364, 373, 106 S.Ct. 2988, 2994, 92 L.Ed.2d 296 (1986), which singularly observed as an example of a condition incompatible with a treatment purpose "a regimen which is essentially identical to that imposed upon felons with no need for psychiatric care." *Young,* 857 P.2d at 1003. Moreover, in its further comment on statutory purposes, the Washington court noted that the statute served its declared purposes because it demanded execution of a treatment program and was implemented by regulations requiring individualized treatment plans for all patients. *Id.* at 1004–05.

Finally, amicus curiae cites *In re Turay,* 139 Wash.2d 379, 986 P.2d 790 (1999). Contesting his commitment, Turay claimed as one of a number of asserted trial court errors that the court denied him his right to a defense by refusing to hear evidence on conditions at the state treatment facility. *Id.* at 802–03. The supreme court held that the proposed evidence was irrelevant:

> Turay's arguments in regard to this issue are meritless and demonstrate a fundamental misunderstanding of the purpose of [the] commitment proceeding. The trier of fact's role in [the] proceeding, as the trial judge correctly noted, is to determine whether the defendant constitutes [one whose condition requires commitment]; *it is not* to evaluate the potential conditions of confinement....

*Id.* at 803 (emphasis in original).

The *Turay* court adds: "[A] person committed under [the statute] may not challenge the actual conditions of their confinement, or the quality of the treatment at the [state] facility until they have been ... committed...." *Id.* The case deals with

the scope of trial evidence, not a pre-commitment examination of substantive due process. *Id.* at 802–03. Insofar as we consider the holding in the context of such a pre-commitment inquiry, it shows a general flaw in the district court's substantive-due-process investigation.

With similar impact, and with a rationale matched by the Supreme Court in *Seling*, the *Turay* court rejected an "as-applied" study of the civil nature of commitment to examine Turay's double jeopardy claim. *Id.* at 810. The court acknowledged that this analysis precludes an as-applied analysis until after the patient is committed. But the court observed that the patient had ample remedies after commitment, already evident for Turay because of his success in gaining federal court monitoring of his treatment conditions. *Id.* at 811–12.

In sum, amicus curiae furnishes this court a case analysis, filling a gap left by the district court and respondent. But none of the cases actually permit the substantive-due-process approach of the district court.

Because a review of precedents leaves no room for the district court's substantive-due-process inquiry, we need not address appellants' additional arguments either that the court hearing and preceding discovery would be overly burdensome or should be conditioned upon an offer of proof.

*Public Information*

 The brief of amicus curiae gives closing emphasis to public information on commitment laws and their implementation; the brief states that this information makes it likely that a district court hearing will show a scheme of preventive detention. This argument encompasses public records and newspaper articles, articles by amicus and others, and legislative recordings. The argument does not affect our analysis of the district court's hearing or-

der, which is not permitted by governing cases.

The brief also asserts that this information constitutes evidence, even without an evidentiary hearing, "supporting an inference that the true purpose of the sex offender commitment scheme is punitive." And the district court stated its conclusion that discharge information suggests the statutes are "anathema" to due process.

 We do not examine the impact of these records. The record gives scant attention to this information, except as respondent argued and the district court agreed, without explanation, that discharge information was probative. Thus, the district court has not analyzed either the relevance or the weight of these public records. As amicus curiae acknowledges, drawing inferences from the facts is a matter assigned, in the first instance, to the district court.

Moreover, the district court also had before it the affidavit of the MSOP director, but its contents were not discussed either by respondent or the court. This affidavit (1) demonstrates familiarity with program practices, (2) portrays the adequacy of program design and staffing, (3) details the phases of treatment leading to intensive supervision, (4) reports that the program is progressive, recently revamped, and thus improved and up-to-date, (5) says the program is in compliance with relevant standards, which are need-based, and (6) reports the number of patients in advanced treatment stages.

Our review of this public information is also inappropriate because no authority has been furnished that shows the significance of these records, pertinent either to substantive due process or to other constitutional standards. Amicus curiae cites two cases on this topic, but neither is significant in the context of initial commit-

ment determinations or constitutional challenges.

### 3.

 On respondent's constitutional objections, the district court initially placed the burden on appellants and required the strict-scrutiny standard. Then in its December order, the court shifted the burden to respondent and used the beyond-a-reasonable-doubt standard. With constitutional challenges to the civil commitment statutes, the supreme court has placed the burden on the state and used strict scrutiny to evaluate the civil commitment statutes. *See Linehan III,* 557 N.W.2d at 181 (using strict scrutiny to evaluate substantive-due-process claim); *Blodgett,* 510 N.W.2d at 914 (same). But respondent did not challenge the district court's final determination on his burden. Because the issue was not raised on appeal, we do not address it further. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988) (noting that appellate court generally will not consider matters not argued to and considered by the district court when "deciding the matter before it").

Review also is inappropriate on respondent's additional argument that substantive due process requires the use of a criminal law burden of proof in commitment cases. The district court based its inquiry entirely on general validity and did not rule on respondent's burden-of-proof assertion. *See id.* at 582–83 (Minn.1988) (noting that appellate court generally will not consider matters not argued to and considered by the district court when "deciding the matter before it"). This court is an error-correcting court and because the district court has not ruled on respondent's burden-of-proof argument, we are not to address the issue. *See Sefkow v. Sefkow,* 427 N.W.2d 203, 210 (Minn.1988) (noting that appellate court's function is identifying and correcting errors).

### DECISION

Respondent's claim regarding issues related to his right to treatment is not ripe. The district court's investigation of constitutional violations under a substantive-due-process standard focusing on the treatment of others is precluded by governing cases. We reverse the district court's decision to hold an evidentiary hearing and conduct related discovery to determine the constitutionality of the SDP and SPP statutes, and we remand for further proceedings.

**Reversed and remanded.**