### In the Matter of the CIVIL COMMITMENT OF Terry Ray JACKSON.

### No. CX–02–1732.

Court of Appeals of Minnesota.

March 25, 2003.

Review Denied May 20, 2003.

Warren J. Maas, Brooklyn Park, MN, for appellant Terry Ray Jackson.

Amy Klobuchar, Hennepin County Attorney, John L. Kirwin, Assistant County Attorney, Minneapolis, MN, for respondent Hennepin County.

Considered and decided by
PETERSON, Presiding Judge,
SHUMAKER, Judge, and FORSBERG,
Judge.*

OPINION

PETERSON, Judge.

Appellant challenges his commitment as a sexually dangerous person, arguing that the district court abused its discretion when it based its finding that appellant engaged in a course of harmful sexual conduct on (1) recanted evidence; (2) evidence that the prosecutor deemed to be not credible; and (3) dismissed criminal charges. Appellant also argues that the district court abdicated its responsibility to interpret and apply the law when it permitted the court-appointed examiners to testify that he met the statutory criteria for commitment. We affirm.

**FACTS**

The state petitioned to commit appellant Terry Ray Jackson as a sexual psychopathic personality and as a sexually dangerous person based on a course of conduct that began almost 20 years ago and includes multiple criminal-sexual-conduct convictions.

In 1984, Jackson lured two girls, ages 13 and 14, into his apartment and sexually assaulted them. Jackson was 20 years old at the time. The victims, C.L. and D.W., were runaways who met Jackson on the street. Jackson was initially pleasant and friendly and invited the girls to his apartment. Once inside the apartment, Jackson immediately became demanding and sexually aggressive. He threatened to strike the girls with a large brass statue unless they performed sexual acts. During re-

peated sexual assaults, Jackson continued to threaten that he would hurt the girls if they did not do what he told them to do. He forced the girls to perform oral sex multiple times, attempted anal intercourse with D.W. several times, ordered the girls to engage in sexual contact with each other, and repeatedly forced vaginal intercourse on D.W. C.L. eventually escaped and called police. When the police arrived, both girls were hysterical and traumatized. They were taken to the hospital by ambulance.

A jury found Jackson guilty of first- and third-degree criminal sexual conduct, and in February 1985, he was sentenced to 43 months in prison. Jackson admitted to sexual conduct, but he claimed that the girls approached him seeking to exchange sex for money, and after he refused to pay them, they accused him of rape. In a 1992 psychological evaluation, Jackson admitted that his sexual contact with C.L. may not have been as consensual as he first assumed and attributed his criminal problems to substance and alcohol abuse.

Jackson was released from prison in January 1987, subject to conditions of supervised release. In February 1988, he was convicted of unauthorized use of a motor vehicle. Also in 1988, he was convicted of simple robbery following a purse-snatching incident in which he threatened the victim with a meat cleaver. He was also arrested several times for domestic assault and disorderly conduct.

In June 1988, Jackson was arrested for sexually assaulting P.J., a 36–year–old woman. Jackson and another man met P.J. on the street and persuaded her to come to Jackson's apartment. Once at the apartment, the men ordered P.J. to take

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

off her clothes and perform oral sex on both of them. When she did not comply fast enough, Jackson beat her on the head with his fists. Jackson hit, kicked, and choked P.J. and repeatedly threatened to kill her. At one point, he struck her in the head with a telephone and ordered her to lick the blood off her face. He forced her to perform oral sex numerous times during a four-hour period and beat her when she was not "doing it right." He forced vaginal intercourse, attempted anal intercourse, and digitally penetrated P.J.'s rectum. She tried to escape several times, but each time Jackson caught her and beat her. He spilled beer on his chest and made her lick it off, and then he urinated on her face. When Jackson went into the bathroom, P.J. fled, but Jackson caught her. While she kicked and screamed for help, he dragged her and tried to ram her head into a building and against a car and threatened to kill her. When the police arrived, they saw Jackson standing over P.J., who was kneeling on the ground.

Jackson was charged with first-degree criminal sexual conduct, but the charge was dismissed after P.J. failed to appear to testify at trial. The matter was charged again in 1992 after P.J. was located and Jackson was arrested on another criminal-sexual-conduct charge stemming from an incident that occurred in 1991. P.J. was scheduled to testify at the trial on the new charges, but became upset when Jackson's mother visited her to ask her to change her testimony against Jackson. Eventually, the case involving P.J. was dismissed because the statute of limitations had expired before the case was charged the second time. Jackson claimed that his sexual contact with P.J. was consensual and that he beat her only because he was drunk, high on cocaine, and believed that she was trying to steal from him.

In September 1991, Jackson sexually assaulted N.M., a 26–year–old woman. Jackson approached N.M. as she left a bar in Minneapolis around midnight. N.M. was intoxicated and upset after arguing with her boyfriend. She accepted Jackson's invitation to come to his house for a drink. Once inside his house, Jackson became sexually aggressive and tried to take off N.M.'s clothes. When she resisted, Jackson struck her several times with his fist, choked her, and pulled her hair. While holding onto N.M., Jackson removed his pants and masturbated. He then removed her pants and forced his fingers into her vagina. Jackson also threatened to kill N.M. She could not escape because he had locked the door from the inside. Around 4:30 a.m., Jackson unlocked the door and let N.M. out. She ran into a newspaper delivery person who helped her call the police. The delivery person's statement indicated that N.M. was bleeding profusely about her face with blood dripping on the sidewalk. When the police arrived, N.M.'s face was swollen, and she had dried blood on her lips. N.M. suffered numerous injuries, including two black eyes, a bloody nose, choke marks on her neck, and bruises, cuts, and scratches on her arms and legs.

Jackson was charged with first- and third-degree criminal sexual conduct. The charges were eventually dismissed because the prosecutor believed that N.M.'s credibility at trial would be undercut due to her level of intoxication at the time of the assault and her admission that she tampered with evidence when, after realizing that she had inadvertently laundered the shirt she was wearing when she was assaulted, she cut her finger and dabbed her blood on the shirt.

At the commitment hearing, Jackson denied having any sexual contact with N.M. He claimed that her story was incredible

because he could have easily subdued her if he wanted to due to her relatively small stature and his strength and that N.M. left his home shortly after arriving because she referred to him as a "nigger," and he asked her to leave.

In June 1992, Jackson attacked M.H., a 44–year–old woman with a mental disorder. Jackson approached M.H. in the early morning hours as she was walking home and invited her to his home to drink alcohol and smoke crack. M.H. agreed to have a drink. Twenty minutes after arriving at his house, Jackson became sexually aggressive and threatening. He hit M.H. in the head with his fist several times and bit her on her neck. Because the door was locked from the inside, M.H. could not escape. M.H. fought back, using a frying pan and a drapery rod. Eventually, when Jackson could not control M.H., he called 911 and told the operator that there was a crazy woman in his house. The sounds of struggling and M.H. yelling "date rape" can be heard on the tape of the 911 call. Soon after making the 911 call, Jackson opened the door and let M.H. out. M.H. went to a neighboring house, and the neighbor called 911. The neighbor described M.H. as nervous, frightened, crying, and disheveled. The neighbor said that M.H. showed her the injuries on her neck and told her that she was almost raped. M.H. suffered injuries with bruising on her neck, legs, arms, and forehead. A jury convicted Jackson of attempted first-degree criminal sexual conduct for his assault of M.H., and he was sentenced to 150 months in prison.

Jackson denied that he attempted to rape M.H. but admitted assaulting her after she went "crazy." Jackson claimed that he and M.H. went to his house to smoke crack, and when he complained about the quality, she "went crazy" and assaulted him. He referred to his 911 call as proof that M.H. victimized him.

Jackson asserts that his habitual alcohol and cocaine use account for all of the difficulties in his life, and he believes himself to be the victim of racial inequities of the legal system. During psychological evaluations, Jackson admitted that his use of alcohol renders him powerless and that he is easily overcome by temptation. Jackson was offered chemical-dependency treatment numerous times, but each time he either resisted treatment or his disciplinary violations interfered with treatment. Jackson has not entered or completed any sex-offender treatment programs, though he has been encouraged to do so on numerous occasions. Psychological-test results placed Jackson in categories where violent or sexual recidivism is highly likely to occur.

Jackson accumulated numerous disciplinary violations while in prison despite warnings and negative consequences. While serving the sentence for his most recent criminal-sexual-conduct conviction, Jackson accumulated more than 30 discipline reports due to violent assaults, disobeying orders, possessing contraband, destroying state property, and inappropriate sexual behavior. Jackson exposed himself to and masturbated in front of female guards and others numerous times between 1996 and 2000.

The district court found that Jackson's offenses followed a distinct pattern. He engaged vulnerable women in friendly conversation with the promise of alcohol or drugs and took them to his home where he demanded sexual acts. When the women refused to submit to his demands, he threatened them and beat them. He maintained control over his victims with his strength and by locking them inside his house. When apprehended, he consistently claimed that any sex was consensual and

described a scenario where he reacted because the woman did something to him. The court found that Jackson had no empathy with his victims and no plan to avoid future sexual offenses, in part because of his refusal to recognize his problem or enter treatment.

The district court concluded that there was not clear and convincing evidence that Jackson is a sexual psychopathic personality as defined in Minn.Stat. § 253B.02, subd. 18b (2002), but that there was clear and convincing evidence that Jackson is a sexually dangerous person as defined in Minn.Stat. § 253B.02, subd. 18c (2002).

## ISSUES

1. Does the evidence support the district court's finding that Jackson engaged in a course of harmful sexual conduct?

2. Did the district court abuse its discretion by permitting the court-appointed examiners to testify that Jackson met the statutory criteria for commitment as a sexually dangerous person?

## ANALYSIS

■■■ On appeal from an order committing a person as a sexually dangerous person,

> this court is limited to an examination of the [district] court's compliance with the statute, and the commitment must be justified by findings based upon evidence at the hearing.

*In re Knops,* 536 N.W.2d 616, 620 (Minn. 1995) (citations omitted) (commitment as mentally ill and dangerous); *see* Minn. Stat. § 253B.185, subd. 1 (2002) (provisions of commitment statute pertaining to persons who are mentally ill and dangerous to the public apply with like force and effect to person alleged to be sexually dangerous person). "The record is viewed in the light most favorable to the [district] court's decision." *Knops,* 536 N.W.2d at 620.

Findings of fact shall not be set aside unless clearly erroneous, and due regard is given to the opportunity of the district court to judge the credibility of witnesses. *Id.*

■■■ The petitioner must prove by clear and convincing evidence that the standards for commitment as a sexually dangerous person are met. Minn.Stat. § 253B.18, subd. 1(a) (2002). This court reviews de novo whether the record contains clear and convincing evidence that each element of the standard for commitment has been met. *In re Linehan,* 518 N.W.2d 609, 613 (Minn.1994).

A "sexually dangerous person" means a person who:

> (1) has engaged in a course of harmful sexual conduct as defined in subdivision 7a;

> (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and

> (3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.

Minn.Stat. § 253B.02, subd. 18c(a) (2002).

1. Jackson argues that the district court's finding that he engaged in a course of harmful sexual conduct is not supported by clear and convincing evidence because the finding is based in part on three incidents where the victim (1) recanted her testimony; (2) failed to appear at trial to testify against him; or (3) was deemed by the prosecution to be not credible. Jackson contends that because only one of the incidents that the district court relied on was not based on highly questionable evidence, the district court's finding that he engaged in a course of harmful sexual conduct is erroneous. We address each of the incidents that Jackson contends were shown only by highly questionable evidence:

a. Although a jury found Jackson guilty of attempted first-degree criminal sexual conduct in November 1992 for his assault of M.H., Jackson contends that the assault cannot be part of a course of harmful sexual conduct because M.H. recanted her allegations of rape at Jackson's commitment hearing. But the district court found that M.H.'s testimony at the commitment hearing "contained inconsistent and incredible facts that varied remarkably from what she told the police in 1992," and that M.H.'s testimony "was not credible and was obviously influenced by her contact with [Jackson's] mother."

The court also found that Jackson's mother visited M.H. sometime before the commitment hearing and asked her to "tell the truth" and that Jackson admitted that he asked his mother to do this. Jackson's mother persuaded M.H. to sign a prepared statement that she took with her to M.H.'s home, but the district court found the written statement "devoid of any persuasive value."

In light of the district court's determination that M.H.'s attempt to recant her allegations of rape was not credible, Jackson's conviction of attempted first-degree criminal sexual conduct for assaulting M.H. was not shown only by highly questionable evidence. Recognizing this conviction as part of a course of harmful sexual conduct was justified by findings based upon evidence presented at the commitment hearing.

b. In 1988, Jackson was charged with first-degree criminal sexual conduct for the assault of P.J., but after P.J. failed to appear to testify at trial, the matter was dismissed. In 1992, Jackson was charged again for the assault after P.J. was located and Jackson was arrested for a sexual assault against N.M. P.J. was scheduled to testify at the trial on the charges involving N.M., but three days before the trial began, P.J. reported that Jackson's mother had visited her and asked her to change her testimony against Jackson. On the morning of trial, P.J. reported that she was very upset that Jackson's family had found her. The charges against Jackson for the assault against P.J. were finally dismissed because the statute of limitations had expired when charges were reissued in 1992.

Although the charges against Jackson for the assault on P.J. were ultimately dismissed, there is clear and convincing evidence in the record of the commitment proceeding that indicates that the assault occurred. The record contains police reports, the statement P.J. gave police at the time of the assault, and the statement that the other man who was present at the time of the assault gave police. There is no evidence that discredits P.J.'s report, and the police reports indicate that the police found Jackson outside standing over P.J., which corroborates P.J.'s report that Jackson chased her when she fled from his home.

Jackson testified at the commitment hearing that the sexual contact with P.J. was consensual, but the district court specifically discredited his testimony, finding it "incongruent and inconsistent." Recognizing the assault on P.J. as part of a course of harmful sexual conduct was justified by findings based upon evidence presented at the commitment hearing.

c. Jackson argues that there is not clear and convincing evidence that he sexually assaulted N.M. in 1991 because the criminal matter was dismissed because the prosecutor believed that N.M. was not credible. But the commitment court found that the criminal matter was dismissed because the prosecutor believed that N.M.'s testimony would seem incredible to a jury due to her level of intoxication at the time of the assault and her admission

that she tampered with evidence by adding blood to her shirt after she got home. The commitment court did not find that the prosecutor believed that N.M.'s account of the incident itself was not credible.

Furthermore, N.M. testified at the commitment hearing, and the court found that N.M. "explained her state of intoxication persuasively" and that her explanation for putting more blood on her shirt to improve the likelihood that Jackson would be convicted "appeared to be candid and reasonable, although the conduct she described would obviously be fatal to a successful prosecution." The court also found that N.M.'s testimony at the commitment hearing closely followed statements given by corroborating witnesses to the police at or near the time of the assault. Recognizing the assault on N.M. as part of a course of harmful sexual conduct was justified by findings based upon evidence presented at the commitment hearing.

As to Jackson's argument that two of the incidents never resulted in criminal convictions, this court has previously concluded that a course of conduct need not consist solely of convictions, but may also include harmful sexual conduct for which the offender was not convicted. *In re Civil Commitment of Ramey,* 648 N.W.2d 260, 268 (Minn.App.2002).

■ 2. Jackson argues that by asking the court-appointed examiners whether he met the statutory criteria for commitment, the district court permitted the witnesses to assume the court's responsibility of determining the facts and applying the law. Jackson contends that answering this question required no psychological expertise and instead required statutory interpretation, which psychologists are not competent to provide.

Minn. R. Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Minn. R. Evid. 704 provides:

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

■ "[T]he reception of opinion evidence on ultimate issues rests largely in the discretion of the [district] court." *State v. McCarthy,* 259 Minn. 24, 32, 104 N.W.2d 673, 678 (1960).

Jackson acknowledges that it is within the broad discretion of the district court to admit an expert opinion that embraces the ultimate legal issue, but he argues that allowing the examiners to testify whether he met the statutory criteria for commitment was beyond the court's discretion because answering the question did not require the expertise of a psychologist. We disagree.

The specialized knowledge of a psychologist could assist the trier of fact to determine whether each of the three criteria in the definition of "sexually dangerous person" is met. As we have already stated, Minn.Stat. § 253B.02, subd. 18c(a), provides:

A "sexually dangerous person" means a person who:

(1) has engaged in a course of harmful sexual conduct as defined in subdivision 7a;

(2) has manifested a sexual, personality, or other mental disorder or dysfunction; and

(3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.

" 'Harmful sexual conduct' means sexual conduct that creates a substantial likelihood of serious physical or emotional harm to another." Minn.Stat. § 253B.02, subd. 7a(a) (2002).

Each of the criteria used to determine whether a person is a sexually dangerous person involves an assessment of the psychological state of either the person whose conduct is being assessed or a person who was harmed by the conduct, and the specialized knowledge of a psychologist may assist the trier of fact in determining a person's psychological state.

Furthermore, Minn.Stat. § 253B.07, subd. 3 (2002), provides that after a commitment petition has been filed, the court shall appoint an examiner. *See also* Minn. Stat. § 253B.18, subd. 1(a) (2002) (upon filing of petition alleging that proposed patient is a person who is mentally ill and dangerous to the public, court shall hear petition as provided in sections 253B.07 and 253B.08); Minn.Stat. § 253B.185, subd. 1 (provisions of commitment statute pertaining to persons who are mentally ill and dangerous to the public apply with like force and effect to person alleged to be sexually dangerous person). And the rules of civil commitment require the court-appointed examiner to examine the person for whom commitment is sought and prepare a

> report stating the examiner's opinion and the facts upon which the opinion is based. The report shall address:
>
> (a) Whether the [person for whom commitment is sought] is * * * a sexually dangerous person, or a sexual psychopathic personality; * * *
>
> (f) If the petition alleges that the [person for whom commitment is sought] is a sexual psychopathic person-

ality and/or a sexually dangerous person, the report shall address each element set out in Minn.Stat. § 253B.02, subd. 18b and 18c respectively, including an opinion as to the likelihood that the [person for whom commitment is sought] will engage in future dangerous behavior.

These procedures for appointing an examiner to prepare a report explicitly require the report to include the examiner's opinion whether the person for whom commitment is sought is a sexually dangerous person and explicitly require the examiner to address each of the criteria in the definition of a sexually dangerous person under Minn.Stat. § 253B.02, subd. 18c. In light of these explicit requirements, we conclude that when the district court asked the expert psychological witnesses whether Jackson met the statutory criteria for commitment, the district court did not invite the witnesses to assume the court's responsibility of determining the facts and applying the law.

Finally, the district court's findings of fact and conclusions of law demonstrate that it independently evaluated whether Jackson satisfied each of the elements for commitment. Although both experts testified that Jackson met the requirements for commitment as both a sexual psychopathic personality and a sexually dangerous person, the court concluded that Jackson met only the requirements for commitment as a sexually dangerous person.

## DECISION

The district court's finding that Jackson engaged in a course of harmful sexual conduct is supported by clear and convincing evidence, and the district court did not abuse its discretion by permitting the court-appointed examiners to testify whether Jackson met the statutory criteria

for commitment as a sexually dangerous person.

**Affirmed.**