In the Matter of the CIVIL COMMITMENT OF Ryan Patrick NAVRATIL.

No. A10–2289.

Court of Appeals of Minnesota.

June 13, 2011.

**644**

James S. Dahlquist, Minneapolis, MN, for appellant.

Lori Swanson, Attorney General, John D. Gross, Assistant Attorney General, St. Paul, MN; and Christopher Karpan, Douglas County Attorney, Alexandria, MN, for respondent.

Considered and decided by BJORKMAN, Presiding Judge; STONEBURNER, Judge; and RANDALL, Judge.

## OPINION

BJORKMAN, Judge.

Appellant challenges his indeterminate civil commitment as an SDP, arguing that the district court erred in concluding that he is an SDP and in indeterminately committing him when the treatment facility did not treat him during his initial commitment period. We affirm.

## FACTS

Appellant Ryan Navratil was born in April 1981, and his biological parents divorced shortly thereafter. His father remarried when Navratil was approximately five years old. Shortly before the marriage, one of Navratil's stepbrothers committed suicide by hanging himself in the family home; Navratil found the body.

Navratil was first exposed to sexual activity sometime between the ages of 3 and 5, when he discovered his brothers watching pornography. At approximately five years of age, Navratil kissed and fondled a same-age neighbor girl. For a two-year period, beginning at age 6 or 7, Navratil "made out" with a cousin one year younger than he and kissed his soon-to-be stepsister and touched her vagina. Around age 11, Navratil began to kiss and fondle girls he was "dating." At age 12, Navratil twice masturbated and had the family dog lick

the ejaculate off of him, which "kind of aroused" him and "felt good." He subsequently felt ashamed of his conduct with the dog and attempted to hang himself from a tree branch. At the age of 16, Navratil began having sexual intercourse with a same-age girl. The relationship did not last long, and Navratil continued to pursue multiple sexual partners.

Navratil also engaged in nonsexual criminal and antisocial conduct during his preteen and teenage years. Beginning at the age of 11, Navratil was involved in numerous thefts, including acting as lookout while a friend stole money from purses on five or six occasions, stealing baseball cards from a store, and periodically stealing money from his parents and other family members. Navratil started to drink alcohol at the age of 16. The following year, Navratil stole from vending machines at his workplace, resulting in a misdemeanor theft conviction. Around that same time, Navratil vandalized and stole items from cars. When he became bored with that, Navratil began breaking into the houses of people he knew, tracking their schedules to know when they would be away and stealing things that he had admired while visiting their houses.

Navratil committed his first sexual assault in June 1998, when he was 17 years old. Navratil saw 16–year–old T.A.K., whom he had previously dated, at a bonfire party, and they went for a ride on T.A.K.'s moped. T.A.K. was drinking alcohol and did not know what was going on when Navratil got on top of her and penetrated her vagina with his penis. She tried to push Navratil away and told him "no," but Navratil continued to have forced intercourse with T.A.K.

Navratil committed his second sexual assault on the eve of his 18th birthday in April 1999. Navratil took 14–year–old K.E.N. to the home of one of his friends. Navratil provided K.E.N. alcohol and took her into a bedroom where he removed her pants and underwear and all of his own clothes. Navratil used his finger to penetrate her vagina. When Navratil then got on top of K.E.N., she told him to stop. Navratil told K.E.N. that it was "all right" and proceeded to have sexual intercourse with her. Navratil and K.E.N. stayed the night at Navratil's friend's home, and had sexual intercourse two more times.

In October and November 1999, Navratil engaged in sexual intercourse with 13–year–old A.D.S. on two occasions. A.D.S.'s subsequent pregnancy concerns came to the attention of law enforcement, which led to Navratil's prosecution.

Navratil was charged as a juvenile with three counts of third-degree criminal sexual conduct based on the incidents with K.E.N. and T.A.K. He pleaded guilty to one count of third-degree criminal sexual conduct (statutory rape) involving K.E.N. and entered an *Alford* plea with respect to one count alleging the use of force or coercion against K.E.N. The district court dismissed the charge involving T.A.K. The district court adjudicated Navratil under extended juvenile jurisdiction (EJJ) to a stayed 48–month term and placed him on probation. Navratil also was charged as an adult with two counts of third-degree criminal sexual conduct based on his conduct with A.D.S. He pleaded guilty to one count of third-degree criminal sexual conduct, and the district court sentenced him to a stayed 18–month term and probation. As a condition of both his EJJ and his adult probation, Navratil was required to complete sex-offender treatment.

Navratil's adjustment to probation was "negative and unacceptable." Navratil committed a series of probation violations, including failing to: register as a sex offender, fully disclose his criminal history to employers, and complete sex-offender

treatment despite multiple opportunities. Because of these violations, the district court revoked Navratil's probation in October 2003 and executed his sentences. While in prison, Navratil was assessed for but did not receive sex-offender treatment. He was released in December 2005.

Navratil was placed on intensive supervised release with conditions, including completing sex-offender treatment. Navratil violated the release conditions by failing to communicate with his parole agent about a woman he was dating, being dishonest with an employer about his criminal history, accessing the Internet (including pornography and dating websites), and being terminated from treatment. In November 2006, the Minnesota Department of Corrections ordered Navratil to serve 365 days in prison for his violations. When Navratil entered prison, the department of corrections assessed him for treatment and referred him to a civil-commitment screening committee, which voted to forward his case to the county attorney's office to initiate commitment proceedings.

After the vote but before a commitment petition was filed, Navratil was approved for a different sex-offender treatment program that he was expected to complete in September 2008. Psychological testing indicated that Navratil exhibited a personality disorder with dependent and narcissistic features and that he required long-term sex-offender treatment. Navratil made little progress in treatment; he had only a partial understanding of sexual risk factors and a poor understanding of sexual-offending risk-management strategies. Throughout treatment, Navratil persistently portrayed himself as a victim and minimized the criminality of his conduct.

On May 30, 2008, Douglas County Social Services petitioned the district court to civilly commit Navratil as an SDP and as a sexual psychopathic personality (SPP).

The court appointed two psychologists, Harry Hoberman, Ph.D., and Thomas Alberg, Ph.D., to examine Navratil.

While the petition was pending, the department of corrections extended Navratil's release date so that he could complete sex-offender treatment. Despite his continued involvement in therapy, by mid-2009 Navratil continued to have sexual fantasies about teenage girls and was unable to intervene and redirect his thoughts when a fantasy was unhealthy. By September, treatment staff opined that Navratil was living two different lives—one in his group therapy sessions and one outside of them—and terminated him from treatment. Navratil challenged his termination and was allowed to continue participating in treatment pending the outcome of his appeal to the treatment program.

At the January 2010 trial on Navratil's commitment petition, the district court heard testimony from Navratil, T.A.K., and the court-appointed psychologists. Dr. Hoberman opined that Navratil meets the criteria for commitment as an SPP and an SDP. Dr. Alberg disagreed, stating that Navratil does not meet the criteria for either. The district court also received numerous treatment reports and court records. After the treatment program officially terminated Navratil in February, Dr. Hoberman and Dr. Alberg submitted follow-up reports to the district court. Neither changed his opinion. The district court determined that Navratil meets the SDP criteria and ordered him committed to the Minnesota Sex Offender Program (MSOP); the district court dismissed the petition with respect to the SPP claim.

Two months later, MSOP staff submitted a written treatment report to the district court stating that Navratil continued to meet the statutory definition of an SDP. The report was based on Navratil's records and a 60-minute interview with him,

and indicated that Navratil's condition was unchanged from the time of his initial commitment. The district court conducted a review hearing, at which Navratil testified that he had not received any treatment at MSOP. The MSOP treatment report confirmed that Navratil had resided in "non-treatment units since his admission to MSOP." The district court found that the treatment report "essentially acknowledges that it is based entirely on information predating the initial commitment." The court concluded that while the county did not provide evidence that Navratil continues to meet the SDP criteria, the lack of treatment "that could improve his condition" made it "intrinsically probable that [Navratil] continues to meet the requirements of the SDP statute." The district court, therefore, ordered Navratil's indeterminate commitment as an SDP. This appeal follows.

## ISSUES

I. Did the district court err in concluding that Navratil is an SDP?

II. Did the district court err in ordering Navratil's indeterminate commitment despite finding that he was not afforded treatment during his initial commitment period?

## ANALYSIS

■ On appeal from an order committing a person as an SDP, "this court is limited to an examination of the [district] court's compliance with the statute, and the commitment must be justified by findings based upon evidence at the hearing." *In re Commitment of Jackson,* 658 N.W.2d 219, 224 (Minn.App.2003) (quotation omitted), *review denied* (Minn. May 20, 2003).

The district court's findings of fact will not be set aside unless clearly erroneous, and the record is viewed in a light most favorable to the findings. *In re Commitment of Ramey,* 648 N.W.2d 260, 269 (Minn.App. 2002), *review denied* (Minn. Sept. 17, 2002). We defer to the district court's opportunity to judge witness credibility. *Id.*

## I. The district court did not err in concluding that Navratil is an SDP.

■ The petitioner must prove by clear and convincing evidence that the criteria for commitment as an SDP are met. Minn.Stat. §§ 253B.18, subd. 1(a), .185, subd. 1(a), (c) (2010). Whether the record contains clear and convincing evidence that the statutory criteria are met presents a question of law, which we review de novo. *In re Commitment of Martin,* 661 N.W.2d 632, 638 (Minn.App.2003), *review denied* (Minn. Aug. 5, 2003).

An SDP is one who:

(1) has engaged in a course of harmful sexual conduct as defined in [Minn. Stat. § 253B.02,] subdivision 7a;

(2) has manifested a sexual, personality, or other mental disorder or dysfunction; and

(3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 7a.

Minn.Stat. § 253B.02, subd. 18c(a) (2010). Navratil challenges the sufficiency of the evidence to establish the second and third of these statutory elements.[1] We address each element in turn.

1. The district court found clear and convincing evidence that Navratil has engaged in a course of harmful sexual conduct based on the incidents with T.A.K., K.E.N., and A.D.S.

Navratil does not challenge that determination, and we agree that the evidence amply establishes this statutory element.

### A. Clear and convincing evidence supports the district court's conclusion that Navratil has manifested a sexual, personality, or other mental disorder.

■ Navratil argues that the district court's conclusion that he has a sexual, personality or other mental disorder or dysfunction within the meaning of the SDP statute is not supported by clear and convincing evidence. We disagree. First, we observe that the district court's conclusion rests primarily on the expert opinions of the court-appointed psychologists, Dr. Hoberman and Dr. Alberg. We defer to a district court's evaluation of expert testimony. *See In re Knops,* 536 N.W.2d 616, 620 (Minn.1995) (stating that "[w]here the findings of fact rest almost entirely on expert testimony, the [district] court's evaluation of credibility is of particular significance"); *In re Pirkl,* 531 N.W.2d 902, 910 (Minn.App.1995) (stating it is the district court's job to weigh experts' opinions regarding commitment), *review denied* (Minn. Aug. 30, 1995).

Second, the record evidence of Navratil's personality disorder supports the district court's conclusion. Based on Navratil's history of antisocial behavior, his sexual history and attitudes, and his sexual misconduct, both court-appointed psychologists diagnosed Navratil with a multifaceted or mixed personality disorder that includes underlying maladaptive personality traits. Dr. Hoberman opined that Navratil "meets the full criteria for an Anti-social Personality Disorder and for a Borderline Personality Disorder," but given Navratil's exhibition of "significant characteristics ... associated with at least three separate personality disorders," he diagnosed Navratil with "either a Personality Disorder NOS [not otherwise specified] or a Mixed Personality Disorder, with prominent Antisocial, Nar-cissistic and Borderline personality traits." (Emphasis omitted.) Dr. Alberg likewise observed that Navratil exhibits characteristics of numerous personality disorders and opined that "the most accurate diagnosis" for Navratil is a mixed personality disorder with a variety of histrionic, narcissistic, and antisocial features.

Navratil disputes the significance of these diagnoses, arguing that his personality disorder does not rise to the level required under the SDP statute because it is "not otherwise specified." We are not persuaded. The psychologists' use of the "not otherwise specified" classification does not diminish the significance of the diagnosis. Rather, the psychologists agreed that Navratil's personality disorder has too many facets to be more specifically defined, not that it is less of a disorder. The record amply demonstrates that Navratil has manifested a multifaceted personality disorder.

Third, the record evidence of Navratil's paraphilia supports the district court's conclusion. Dr. Hoberman diagnosed Navratil with paraphilia not otherwise specified, explaining that Navratil "appears to meet criteria for Hebephilia," which involves "sexual fantasies, sexual urges and/or sexual behavior involving female peri-pubescent or post-pubescent children." Dr. Alberg similarly opined that Navratil's "special attraction to adolescent girls" tends to indicate that he "would meet the criteria for hebephilia" but noted that Navratil had not been diagnosed, in a treatment setting, with paraphilia. Accordingly, Dr. Alberg characterized non-specified paraphilia as a diagnosis to rule out. Viewed in the light most favorable to the findings, this evidence amply demonstrates that Navratil has manifested a sexual disorder.

On this record, we conclude that the district court did not err in finding clear and convincing evidence that Navratil has manifested personality and sexual disorders that satisfy the second element of the SDP statute.

### B. Clear and convincing evidence supports the district court's conclusion that Navratil is highly likely to reoffend sexually.

■■ The SDP statute requires that an individual be "likely" to engage in harmful sexual conduct as a result of a disorder or dysfunction. To satisfy this element, there must be clear and convincing evidence that the individual is "highly likely [to] engage in harmful sexual acts in the future." *In re Commitment of Stone*, 711 N.W.2d 831, 840 (Minn.App.2006) (alteration in original) (quoting *In re Linehan*, 594 N.W.2d 867, 876 (Minn.1999) (*Linehan IV*) ), *review denied* (Minn. June 20, 2006). To determine whether a person is "highly likely" to reoffend, a district court must consider six factors:

(1) the offender's demographic characteristics; (2) the offender's history of violent behavior; (3) the base-rate statistics for violent behavior among individuals with the offender's background; (4) the sources of stress in the offender's environment; (5) the similarity of the present or future context to those contexts in which the offender used violence in the past; and (6) the offender's record of participation in sex-therapy programs.

*Id.* (citing *In re Linehan*, 518 N.W.2d 609, 614 (Minn.1994) (*Linehan I* ), and *In re Linehan*, 557 N.W.2d 167, 169 (Minn.1996) (*Linehan III* ), *vacated on other grounds*, 522 U.S. 1011, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997), *aff'd on remand*, 594 N.W.2d 867 (Minn.1999)).

■ Navratil argues that the district court erred in finding him highly likely to reoffend because the third *Linehan* factor, the base-rate statistics for violent behavior among individuals with his background, indicates that he is unlikely to cause future harm. We disagree. No single factor is determinative of this complex issue. *See Linehan III*, 557 N.W.2d at 189 (stating that statistical evidence of recidivism "is only one of the six factors" and that district courts may consider evidence beyond the *Linehan* factors in addressing the "complex and contested" matter of predicting dangerousness). And the district court's reasoned consideration of all of the *Linehan* factors, including the base-rate statistics, is supported by the record and consistent with the law.

Both Dr. Alberg and Dr. Hoberman relied on multiple statistical analyses to determine Navratil's likelihood of reoffending as compared to other offenders, some of which indicated only a low to moderate risk of recidivism and some of which indicated a risk as high as 58% over seven years or 80% over ten years. Both psychologists noted the tendency of the various tests to underestimate recidivism rates and the necessity of considering the statistical analyses in the context of the other information about an offender. But they disagreed about the significance of the statistical evidence as applied to Navratil. The district court rejected both psychologists' opinions and gave "little weight" to their testimony regarding statistical indicators. On this record, the district court did not err by not weighing this factor heavily in favor of or against a finding on the likelihood of future harm.

Nor did the district court err by finding the weight of the other *Linehan* factors highly indicative of future sexual offending. The district court found that Navratil's offense history was not indicative of

future dangerousness because his past offenses were not violent. But the district court determined that the remaining *Linehan* factors indicate future dangerousness. Navratil's demographic characteristics, the sources of stress in his environment, the similarity of his present or future context to previous contexts in which he offended, and his repeated failure to successfully participate in and complete sex-offender treatment programs all indicate that Navratil is likely to reoffend. The opinions of the psychologists, the numerous records of Navratil's treatment failures, and ample additional evidence support this determination. Because four of the six *Linehan* factors indicate a likelihood that Navratil will reoffend and the other two do not provide a substantial basis for finding otherwise, the district court did not err in finding him highly likely to reoffend.

Based on our careful review of the evidence, we conclude that the record contains clear and convincing evidence that Navratil engaged in a course of harmful sexual conduct and has personality and sexual disorders that make him highly likely to engage in harmful sexual conduct in the future. The district court did not err in concluding that Navratil is an SDP.

## II. The district court did not err in ordering Navratil's indeterminate commitment despite finding that he was not afforded treatment during his initial commitment period.

The Minnesota Commitment and Treatment Act (CTA) prescribes the procedure for the indeterminate commitment of SDPs. First, the district court must determine whether the individual meets the statutory criteria for commitment and, if so, order commitment to an appropriate treatment facility. *See* Minn.Stat. §§ 253B.18, subd. 1 (setting forth procedure for mentally-ill-and-dangerous com-mitment), .185, subd. 1 (incorporating procedure from section 253.18 for SDP commitment) (2010). Within 60 days of the initial commitment, the treatment facility is required to submit to the district court a treatment report addressing, among other factors, the individual's treatment plan, a description of treatment efforts, the individual's "present condition and behavior," the individual's prognosis, and any facts that establish that the individual continues to satisfy the statutory requirements for commitment. Minn. Spec. R. Commit. & Treat. Act 23(d); *see also* Minn.Stat. § 253B.18, subd. 2 (2010). Upon receipt of the treatment report, the district court must conduct a review hearing to determine whether the individual continues to meet the statutory criteria for commitment. Minn.Stat. §§ 253B.18, subds. 2–3, .185, subd. 1(c), (e) (2010). The CTA does not condition resolution of this issue on the treatment, if any, the individual received during the initial period of commitment. Rather, if the individual continues to meet the statutory criteria for commitment as an SDP, "the court shall order commitment for an indeterminate period of time." Minn.Stat. § 253B.185, subd. 1(e).

■ Navratil argues that ordering his indeterminate commitment without regard to the availability of treatment amounts to a deprivation of due process. We are not persuaded. A committed individual has a statutory and constitutional right to treatment. *See* Minn.Stat. § 253B.03, subd. 7 (2010) (declaring that a committed individual has "the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary"); *In re Blodgett*, 510 N.W.2d 910, 916 (Minn.1994) (stating that "[s]o long as civil commitment is programmed to provide treatment and periodic review, due

process is provided"). But the commitment process is not the proper avenue for asserting a right-to-treatment argument. *See In re Pope*, 351 N.W.2d 682, 683 (Minn.App.1984). The treatment of committed individuals is the province of the commissioner of human services, not the district court. *See* Minn.Stat. § 253B.03, subd. 7; *In re Wicks*, 364 N.W.2d 844, 847 (Minn.App.1985) (holding that district court erred in prescribing a treatment program), *review denied* (Minn. May 31, 1985). And a committed person has adequate avenues outside the commitment process for asserting a right-to-treatment issue. *See In re Commitment of Travis*, 767 N.W.2d 52, 58–59 (Minn.App.2009) (available legal avenues include habeas corpus, declaratory or injunctive relief, or a special review board); *Pope*, 351 N.W.2d at 683 (stating that "treatment of patients is properly raised before a hospital review board"); *see also* Minn.Stat. §§ 253B.22 (providing for review boards), .23, subd. 5 ("Nothing in this chapter shall be construed to abridge the right of any person to the writ of habeas corpus.") (2010).

Because the availability or adequacy of treatment afforded to committed individuals is outside the scope of the commitment process, we conclude that the district court did not err in ordering Navratil's indeterminate civil commitment despite evidence that he had not received treatment at MSOP during his initial commitment period.

Finally, we note the district court's concern that the multi-phase indeterminate commitment procedure may be better suited to "determin[ing] whether a mentally ill but dangerous patient had been stabilized to the point that indeterminate commitment was inappropriate" and seems "disin-genuous" as applied to SDPs, who are unlikely to demonstrate improvement in the brief initial commitment period. But this arguable superfluity in the SDP commitment process is a statutory provision that is not for this court to change. Moreover, we observe that the additional layer of judicial review before indeterminate commitment permits the district court not only to take into account any changed circumstances but also to correct any mistakes that may have occurred in the initial commitment. *See* Minn. Spec. R. Commit. & Treat. Act 23(b) (providing for a range of dispositions after review hearing, including discharge); *Linehan III*, 557 N.W.2d at 171 (stating that scope of review hearing encompasses the treatment report, evidence of changes in the individual's condition since the initial commitment hearing, and "such other evidence as in the district court's discretion enhances its assessment of whether the patient continues to meet statutory criteria for commitment"). Ultimately, indeterminate commitment is predicated upon a determination that the individual continues to meet the statutory criteria for commitment. The district court properly rendered such a determination here.

## DECISION

The record evidence supports the district court's determination that Navratil continues to meet the statutory definition of an SDP and his indeterminate commitment is required. Because the availability of treatment during appellant's initial period of commitment is outside the scope of the commitment process, we discern no constitutional deprivation.

**Affirmed.**

Dissenting, RANDALL, Judge.*

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

RANDALL, Judge.

I dissent from the majority's conclusion that the district court did not err in finding that there is clear and convincing evidence that appellant has a disorder or dysfunction within the meaning of the SDP statute. I would also reverse the indeterminate commitment order and address the denial of treatment to appellant since the initial commitment order.

As I have noted in past concurrences and dissents, the SDP statute and its twin, the SPP statute, have, in the words of Justice Wahl, "creat[ed] a system of wholesale preventive detention, a concept foreign to our jurisprudence." *In re Blodgett*, 510 N.W.2d 910, 918 (Minn.1994) (Wahl, J., dissenting) (footnote omitted), *cert. denied*, 513 U.S. 849, 115 S.Ct. 146, 130 L.Ed.2d 86 (1994); *see In re Civil Commitment of Bryant*, 2011 WL 1237575, at *7 (Minn.App. Apr. 5, 2011) (Randall, J., concurring specially) (noting longstanding use of civil commitment of sexual offenders for preventive detention). But, whatever the merits of sexual-based commitments, when the facts give rise to a concern that "public safety" is used to justify a radical departure from our traditional notions of fairness and due process, you had better have strong and clear and convincing facts. Those facts are not present here.

To be committed as SDP, a person must have "manifested a sexual, personality, or other mental disorder or dysfunction." Minn.Stat. § 253B.02, subd. 18c(a) (2010). The psychologists who evaluated Navratil diagnosed him with a multifaceted or mixed personality disorder, with multiple underlying personality traits. One expert felt that Navratil had traits of antisocial and borderline personality disorders, the other concluded that he had all the traits to meet the definitions of those disorders. But these diagnoses do not show that Navratil, as a result of his condition, would be likely to engage in future acts of harmful sexual conduct, as required by Minn.Stat. § 253B.02, subd. 18c(a)(2), (3).

I recognize that antisocial and borderline personality disorders have been held to support commitment in other cases. *See In re Civil Commitment of Ramey*, 648 N.W.2d 260, 264 (Minn.App.2002) (not addressing degree of mental or personality disorder required). The supreme court has held that an antisocial personality disorder can meet the constitutional requirement of "mental illness" without which commitment would be unconstitutional. *See In re Linehan*, 557 N.W.2d 171, 184–86 (Minn.1996) (rejecting argument that antisocial personality disorder is not constitutionally valid basis for commitment), *vacated on other grounds*, 522 U.S. 1011, 118 S.Ct. 596, 139 L.Ed.2d 486 (1997), *aff'd on remand*, 594 N.W.2d 867 (Minn.1999); *Blodgett*, 510 N.W.2d at 915. But Dennis Linehan had committed numerous sexual assaults, had pleaded guilty to kidnapping in a case in which he was indicted for first-degree murder, and had raped a 12–year–old shortly after being released from prison. *In re Linehan*, 518 N.W.2d 609, 611 (Minn.1994). Blodgett had committed three rapes, including one in which he broke into the home of the victim. *Blodgett*, 510 N.W.2d at 911. In this case, Navratil engaged in sexual misconduct as a juvenile, and in his late teens had sex, some of it consensual, with girls somewhat younger than himself who had not reached the statutory age of consent. There is no evidence of any conduct approaching the violence or general harm which is discussed in *Linehan* and *Blodgett*. Importantly, one of the psychologists who examined Navratil concluded that he did not meet the statutory criteria for commitment.

The key to civil commitment, and the argument that makes it "constitutional," is

the assumption that the dangerous sexual offender can be distinguished from the typical repeat offender. *See Ramey,* 648 N.W.2d at 266. I see nothing in this record that distinguishes Navratil from the typical repeat sex offender, either in his criminal history of juvenile offenses and statutory rape (committed against women slightly younger), or in his diagnosis. (I do not mean to imply that such conduct is not criminal, only that it is not comparable to the violent sexual assaults against the same age group discussed in *Linehan* and *Blodgett.*) One of the experts, in essence, agreed that Navratil cannot be distinguished from the typical recidivist. As many presentence investigations demonstrate, many criminals sentenced to prison, even for the first time, could be, and have been, diagnosed with "antisocial personality disorder or borderline personality disorder."

"[T]he judiciary has a constitutional duty to intervene before civil commitment becomes the norm and criminal prosecution the exception." *Linehan,* 557 N.W.2d at 181. The record is clear that Navratil should be treated as an ordinary sex offender, with a determinate sentence, not locked up in a secure mental-treatment facility for what amounts to a life sentence.

I am concerned, as was the district court (pointedly), that Navratil was housed in a non-treatment unit and denied treatment after his entry into MSOP under the initial commitment order. In its initial order, the district court agreed with Dr. Alberg's assessment that Navratil had been terminated from treatment in prison for exhibiting the very symptoms of narcissistic personality disorder for which he was supposed to be treated. And in its indeterminate commitment order, the court stated that it was "unequivocal and uncontroverted" that MSOP had failed to provide Navratil with the treatment he needs. The court found this procedure for continuing Navratil's commitment "disingenuous."

To affirm the order for indeterminate commitment under these circumstances is to approve the warehousing of another borderline candidate for treatment, with no guarantee that he will receive meaningful treatment. The outright denial of treatment is not an issue that should wait for a habeas petition or an appearance before a special review board. *Cf. In re Commitment of Travis,* 767 N.W.2d 52, 58–59 (Minn.App.2009). There cannot be a meaningful treatment report, or a meaningful determination of whether Navratil's condition since the initial commitment had changed, unless he is given the opportunity to engage in treatment. I dissent.