*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0193**

In the Matter of the Civil Commitment of: John Joseph Kotowski.

**Filed June 29, 2015
Affirmed
Reilly, Judge**

Dakota County District Court
File No. 19HA-PR-13-710

David A. Jaehne, West St. Paul, Minnesota (for appellant John Joseph Kotowski)

James C. Backstrom, Dakota County Attorney, Helen R. Brosnahan, Jennifer L. Jackson, Assistant County Attorneys, Hastings, Minnesota (for respondent Dakota County)

Considered and decided by Larkin, Presiding Judge; Reilly, Judge; and Reyes, Judge.

# UNPUBLISHED OPINION

**REILLY**, Judge

Appellant John Joseph Kotowski challenges his commitment to the Minnesota sex offender program (MSOP) as a sexually dangerous person (SDP) and as a sexually psychopathic personality (SPP) and claims that he received ineffective assistance of counsel. Because clear and convincing evidence supports appellant's commitment as both an SDP and an SPP, and because his counsel was not ineffective, we affirm.

## FACTS

In May 2014, Dakota County petitioned to civilly commit 54-year-old appellant as an SDP and an SPP. The petition is based partially on appellant's extensive history of charged and uncharged criminal offenses.

### Charged Offenses

In 1974, at age 14, appellant was accused of killing his younger stepsister by stabbing her to death. He was never petitioned into juvenile court for this offense. From November 1974 to March 1978, appellant was committed to a treatment center as Mentally Ill and Dangerous to the Public. Appellant was eventually transferred to the Minnesota Security Hospital due to a physical conflict with a treatment center resident, and he stayed there until June 1980.

On April 1, 1986, at age 26, appellant was charged with first-degree criminal sexual conduct and extortion for having sex with 17-year-old S.H. after threatening to show her parents sexually explicit photos if she did not comply with his demands. When S.H. was 14 or 15 years old, she claimed that appellant made her drink alcohol until she passed out, had sex with her, and took nude photos of her. The counts were dismissed by the district court due to insufficient evidence.

On December 30, 1986, appellant handcuffed and raped 16-year-old R.B. in a garage at his residence. Appellant then drove R.B. home and threatened to kill her if she told anyone. Appellant claimed that R.B. offered to exchange sex for cocaine, but he denied having sexual contact with her. The state charged appellant with first-degree criminal sexual conduct and extortion. Appellant pleaded guilty to fourth-degree

criminal sexual conduct, and the district court stayed the execution of his 21-month sentence.

Between June 28, 1988, and September 1, 1988, appellant conspired to have his girlfriend killed after she inadvertently threw away two boxes of cocaine. Appellant met with an undercover agent and provided him with cash, a handgun, and directed the agent to kill his girlfriend. Appellant denied the conspiracy and claimed that he was trying to "buy time" for his girlfriend. The state charged appellant with conspiracy to commit first-degree murder, conspiracy to commit assault, and felon in possession of a handgun. Appellant pleaded guilty to conspiracy to commit first-degree assault and felon in possession of a handgun and was committed to the commissioner of corrections for 32.5 months on the conspiracy conviction with 51 months stayed on the possession conviction. On December 26, 1990, appellant admitted to violating probation and the district court executed the 51-month sentence with credit for time served.

In early December 1990, then 33-year-old appellant forced 16-year-old A.W. into a car, physically assaulted her, forced her to remove her pants, digitally penetrated her vagina, forced her to perform oral sex on him while driving, took her to his apartment, brandished a gun at her, forced her to shave her pubic area, and sexually penetrated A.W. several times. Appellant kept A.W. in his apartment by binding A.W. with tape whenever appellant left his apartment. Appellant claimed that A.W. wrote him letters while he was in prison and that the sexual contact was voluntary. Appellant was charged with first-degree criminal sexual conduct and false imprisonment. Appellant pleaded

guilty to false imprisonment and was committed to the commissioner of corrections for 36 months.

On October 8, 1997, while A.D. was at appellant's residence, appellant choked and threatened to kill A.D. if she did not comply with his orders, causing her physical injuries. He then orally, anally, and vaginally penetrated her. Appellant put his penis in her mouth and took photos. Appellant then took A.D. back to her residence and threatened to kill her if she told anyone. After A.D. reported appellant, a search of appellant's residence revealed a backpack with various lengths of rope, a bottle of liquor, rolls of tape, a condom, a roll of razor wire, a disposable razor, and an empty firearm magazine. Appellant denied that any sexual contact occurred between him and A.D. The state charged appellant with two counts of first-degree criminal sexual conduct and kidnapping, and a jury found him guilty of all three counts. Appellant was committed to the commissioner of corrections for 292 months, with a five- to ten-year conditional release period.

**Uncharged Offenses**

The district court also relied on several uncharged offenses. In 1984, then 25-year-old appellant engaged in sexual activity with 14-year-old S.H. S.H. was the victim of the April 1, 1986 charges. During the summer of 1987, appellant provided liquor to two minor girls, A.W. and B.A. After the girls reached the point of intoxication, appellant raped both girls. A few days later, he again sexually assaulted one of the girls. The offenses were not reported until 1989. On April 22, 1988, appellant took his ex-girlfriend, L.G., to his apartment, physically assaulted her, held a gun to her throat, tied

4

her hands, shaved her pubic region, and sexually assaulted her vaginally and anally with a vibrator and his penis. On May 5, 1988, appellant met L.G. after work and pointed a handgun at her. L.G. ran away. In 1988, appellant sexually assaulted 14-year-old A.W. after providing her alcohol. He then maintained a sexual relationship with her.

On October 22 and 24, 2014, the district court held a civil commitment trial. Prior to the commitment trial, the district court appointed two experts as court examiners: Michael Thompson, Ph.D., and Mary Kenning, Ph.D. Each expert evaluated appellant using actuarial and dynamic risk assessment tools to assess whether he satisfied the criteria for commitment as an SDP and an SPP. Both experts testified that appellant satisfied the criteria for commitment as both an SDP and an SPP and provided testimony explaining their conclusions. In addition to their testimony, both experts filed reports with the court, concluding that appellant satisfies the criteria for commitment as an SDP and an SPP.

The district court credited the experts' testimony and reports and found that appellant satisfies the requirements for commitment as an SDP and an SPP. He was ordered to MSOP in Moose Lake. This appeal follows.

## D E C I S I O N

A person may be civilly committed as an SDP or an SPP if the petitioner proves the statutory criteria by clear and convincing evidence. Minn. Stat. § 253D.07, subd. 3 (2014). "Clear and convincing evidence is evidence that is more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *State v. Jones*, 753 N.W.2d 677, 696 (Minn. 2008). This court reviews a district court's factual findings on the

5

elements of the civil commitment statutes for clear error. *In re Civil Commitment of Stone*, 711 N.W.2d 831, 836 (Minn. App. 2006), *review denied* (Minn. June 20, 2006). "Where the findings of fact rest almost entirely on expert testimony, the [district] court's evaluation of credibility is of particular significance." *In re Knops*, 536 N.W.2d 616, 620 (Minn. 1995). But whether the evidence is sufficient to meet the statutory requirements for commitment is a question of law, which this court reviews de novo. *In re Civil Commitment of Martin*, 661 N.W.2d 632, 638 (Minn. App. 2003), *review denied* (Minn. Aug. 5, 2003).

## I.

An individual is an SDP if he (1) has engaged in a course of harmful sexual conduct; (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and (3) as a result, is likely to engage in acts of harmful sexual conduct. Minn. Stat. § 253D.02, subd. 16 (2014). Appellant only challenges the district court's findings and conclusions regarding the third statutory requirement, which is satisfied if a person is "highly likely" to reoffend by engaging in acts of harmful sexual conduct in the future. *In re Civil Commitment of Ince*, 847 N.W.2d 13, 23 (Minn. 2014).

To determine whether a person is highly likely to reoffend, a district court must engage in a "multi-factor analysis." *Id.* The multi-factor analysis includes consideration of the following six factors, known as the *Linehan* factors:

> (a) the person's relevant demographic characteristics (*e.g.,* age, education, etc.); (b) the person's history of violent behavior (paying particular attention to recency, severity, and frequency of violent acts); (c) the base rate statistics for violent behavior among individuals of this person's

6

> background (*e.g.*, data showing the rate at which rapists recidivate, the correlation between age and criminal sexual activity, etc.); (d) the sources of stress in the environment (cognitive and affective factors which indicate that the person may be predisposed to cope with stress in a violent or nonviolent manner); (e) the similarity of the present or future context to those contexts in which the person has used violence in the past; and (f) the person's record with respect to sex therapy programs.

*Id.* at 22 (quoting *In re Linehan*, 518 N.W.2d 609, 614 (Minn. 1994)). The multi-factor analysis may include other relevant evidence and information, including the actuarial assessment evidence used by the experts here. *Id.* at 24.

Appellant challenges the district court's finding regarding the likelihood of him reoffending on the basis that the court and the experts "double counted" due to their consideration of both the *Linehan* factors and actuarial measures. In *Ince*, the Minnesota Supreme Court reaffirmed the applicability of the *Linehan* factors and made it clear that district courts are required to consider those factors, despite the potential for "factor repetition." *Id.* The *Ince* court then reviewed the third element of the SDP criteria—whether an individual is "likely to engage in acts of harmful sexual conduct." *Id.* at 20-21.

The supreme court began its analysis by rejecting Ince's argument that "likely" means "substantially certain" and confirmed its previous interpretation of "likely" to mean "highly likely." *Id.* Ince further argued that an overreliance on actuarial assessment tools permits "double counting" and thereby artificially inflates an offender's likelihood to reoffend. *Id.* at 22. After acknowledging the difficulties facing district courts in determining whether an individual is highly likely to reoffend, the supreme

7

court noted that the district court is in the best position to weigh each factor and evaluate the credibility of the witnesses. *Id.* at 23-24. The supreme court did, however, caution the district courts

> to be wary of the potential factor repetition that can result from considering the *Linehan* factors in addition to multiple actuarial assessments that use different approaches based on factors that are the same as or similar to the *Linehan* factors. We do not believe it is necessary to delineate here examples in which that repetition can occur. Rather, recognizing that the potential for duplication exists, we rely on the ability of district courts to weigh the evidence in each case, drawing the appropriate conclusions based on consideration of all the evidence.

*Id.* at 24.

Here, the district court recognized the potential for duplication. In its factual findings, the district court cited to appellant's charged offenses, his uncharged offenses, his record of institutionalization and infractions, his lack of sex-offender treatment, his chemical and alcohol dependency and treatment, his mental health evaluations, pertinent parts of the experts' testimony, and the experts' references to double-counting concerns. And appellant does not challenge the district court's factual findings. The district court concluded that there

> is clear and convincing evidence that, as a result of [appellant's] past course of harmful sexual conduct, his mental and sexual disorders, and his lack of adequate control over his sexual impulses, it is highly likely that [appellant] will engage in further acts of harmful sexual conduct and is dangerous to others. . . . This is particularly true because of [appellant's] high actuarial risk assessment scores, his psychopathy combined with sexual deviance, his long history of sexually harmful behavior, his lack of remorse, his dynamic risk factors, and his denial of any sexual offenses.

The district court further found that neither expert "double counted" when considering the *Linehan* factors. Thus, the district court properly considered the *Linehan* factors.

Moreover, this court does not second-guess the weight and credibility the district court gives to the evidence. *In re Knops*, 536 N.W.2d at 620. And the district court is free to weigh both actuarial and non-actuarial evidence and draw conclusions from that evidence as it sees fit. *Id.*; *cf. In re Civil Commitment of Navratil*, 799 N.W.2d 643, 649 (Minn. App. 2011), *review denied* (Minn. Aug. 24, 2011) (stating district courts do not err by discounting risk assessment tools when good and valid reasons exist). Here, the district court and both experts determined that the actuarial and non-actuarial evidence is sufficient to support the determination that appellant is highly likely to offend, and the district court did not abuse its discretion in relying on the unanimous expert opinions.

Appellant also contends that because his predicted likelihood of reoffending over the next ten years is only 48%, he does not satisfy the "highly likely" element of the SPD statute. Appellant claims that, in order to satisfy this element, the supreme court "clearly requires something significantly more than 50.1% to reoffend sexually." The supreme court in *Ince* clearly stated that it was *not* adopting a numeric value to satisfy the "highly likely" element. 847 N.W.2d at 21-22. And the *Ince* court reiterated that the "dangerousness prediction" is "neither a purely clinical prediction nor simply a matter for statisticians." *Id.* at 23. Accordingly, clear and convincing evidence supports the district court's commitment of appellant as an SDP.

## II.

An SPP is defined as

> the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons.

Minn. Stat. § 253D.02, subd. 15 (2014). Generally, when considering whether a person has an utter lack of power to control his sexual impulses, the district court considers the nature and frequency of the sexual assaults, the degree of violence involved, the relationship between the offender and the victims, the offender's attitude and mood, the offender's medical and family history, the results of psychological and psychiatric testing and evaluation, and such other factors that bear on the predatory sex impulse and the lack of power to control it. *In re Blodgett*, 510 N.W.2d 910, 915 (Minn. 1994).[1]

Here, appellant contends that the evidence is insufficient to commit him as an SPP because the evidence was insufficient to commit him as an SDP and the standard to commit as an SDP is higher. Appellant cites no caselaw in support of his contention and, as previously discussed, he satisfies the criteria for commitment as an SDP. Appellant's

---

[1] The district court may also consider the person's need for security, chemical dependency issues, history of flight, and need for sex-offender treatment. *See In re Pirkl*, 531 N.W.2d 902, 907 (Minn. App. 1995), *review denied* (Minn. Aug. 30, 1995); *In re Irwin,* 529 N.W.2d 366, 375 (Minn. App. 1995), *review denied* (Minn. May 16, 1995); *In re Bieganowski*, 520 N.W.2d 525, 529-30 (Minn. App. 1994), *review denied* (Minn. Oct. 27, 1994).

only challenge under the SPP statute is whether the evidence is sufficient to support the district court's conclusion that appellant is dangerous to others because he has an "utter lack of power" to control his sexual impulses.[2] Appellant contends that there is no clear and convincing evidence that he has "demonstrated an utter lack of power to control his sexual impulses such that he is dangerous to others." Appellant argues that he is able "to turn on and off his antisocial or rule breaking behavior," and this is evidence of his ability to control his sexual impulses. Appellant relies on Dr. Thompson's testimony regarding appellant's institutional infractions for support.

During his testimony, Dr. Thompson noted that appellant has not committed any institutional infractions since April 2013. Dr. Thompson believed that this hiatus was due to appellant's knowledge that his case may be forwarded for civil commitment. Because of this, Dr. Thompson did state that appellant "has the ability to control his behavior, he just chooses not to," but he subsequently testified that he did not think appellant's ability to "to turn it off in prison is sufficient to be a sole measure of" appellant's ability to control his behavior. And Dr. Thompson's report concluded that appellant "possesses an utter lack of power to control his sexual impulses." Dr. Kenning testified that appellant has an utter lack of power to control his sexual impulses and based this conclusion on the nature and frequency of appellant's sexual assaults, despite the imposition of sanctions. Thus, this testimony regarding appellant's ability to control his behavior while incarcerated does not support appellant's contention that he has the ability

---

[2] Because appellant does not challenge any of the other SPP requirements, we will limit our analysis to only whether appellant has an utter lack of power to control his sexual impulses.

11

to control his sexual impulses. Accordingly, clear and convincing evidence supports appellant's commitment as an SPP.

**III.**

Appellant argues that he received ineffective assistance of counsel because his previous attorney failed to validate the accuracy of the record. Specifically, appellant claims that he should only have two total convictions, instead of three, because the 1997 convictions were based on conduct involving the same victim.

We apply the criminal standard for analyzing the effectiveness of counsel in civil commitment cases. *In re Dibley*, 400 N.W.2d 186, 190 (Minn. App. 1987), *review denied* (Minn. Mar. 25, 1987). To have a valid ineffective-assistance-of-counsel claim, appellant must show "that counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Reed v. State*, 793 N.W.2d 725, 733 (Minn. 2010).

Here, assuming that the district court and experts did erroneously consider an extra conviction, the consideration of the extra conviction would not have changed the court or the experts' conclusions. Even excluding the second conviction from the October 1997 crime, appellant has been convicted of six crimes arising from sexual assaults. There is no specified number of convictions needed to satisfy the commitment criteria as an SDP or an SPP. *See In re Civil Commitment of Ramey*, 648 N.W.2d 260, 268 (Minn. App. 2002) (reiterating that SDP criteria may take into account convictions and other "conduct amounting to harmful sexual conduct"), *review denied* (Minn. Sept. 17, 2002). And a

12

district court may consider uncharged incidents of sexual conduct. *See In re Civil Commitment of Williams*, 735 N.W.2d 727, 731 (Minn. App. 2007) ("Incidents establishing a course of harmful sexual conduct need not be recent and are not limited to those that resulted in a criminal conviction."), *review denied* (Minn. Sept. 26, 2007). Moreover, the record contains ample evidentiary support of convicted and unconvicted offenses. Accordingly, a successful challenge to the 1997 convictions by appellant's counsel would not have changed the outcome of the civil commitment proceeding.

## IV.

Appellant also appears to challenge his commitment to MSOP for treatment on the ground that it would not provide him with "fair and effective treatment." Appellant presents this argument in his statement of the issues, but he fails to develop the argument in his brief. Moreover, issues concerning the adequacy of sex-offender treatment are premature at the time or immediately after civil commitment. *Navratil*, 799 N.W.2d at 651; *In re Civil Commitment of Travis*, 767 N.W.2d 52, 58 (Minn. App. 2009).

**Affirmed.**